UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| CURTIS BAKER, DAVID HENDERSON and JOE A. CEDILLO, | ) ) ) | Case No. 3:04-0839 |
| Plaintiff-Interveners, | ) ) | Judge Echols |
| 5. | ) ) | |
| J. ALEXANDER'S RESTAURANT, INC., | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM

Pending before the Court is Defendant J. Alexander's Motion for Summary Judgment (Docket Entry No. 13), to which the Equal Employment Opportunity Commission has responded in opposition[1] (Docket Entry No. 23 & 24) and Defendant has replied (Docket Entry No. 27). For the following reasons, Defendant's Motion for Summary Judgment will be granted in part and denied in part.

### I. Facts

The Plaintiff Equal Employment Opportunity Commission ("EEOC") filed suit against J. Alexander's Restaurants Inc. ("JAX") alleging JAX has engaged in reverse gender discrimination in violation of

---

[1]Intervening Plaintiffs joined in, and adopted, the response made by the EEOC. (Docket Entry No. 22).

1

Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2(a) and Section 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a). Plaintiff alleges JAX had a practice of discriminating against males in the selection process for "Pub Keeps" (or bartenders) at its restaurants in Franklin, Tennessee[2] ("JAX Franklin") and Memphis, Tennessee ("JAX Memphis"). Plaintiff Interveners Curtis Baker ("Baker"), Joe Cedillo ("Cedillo"), and David Henderson ("Henderson") (collectively Interveners) are former dining room servers at JAX Franklin who allege they were denied positions as Pub Keeps at JAX Franklin because they are male.

At JAX, the general manager of a restaurant is referred to as a "head coach." (Pf. SOF ¶ 1).[3] Other managers are referred to as "coaches." (Id.). A server could report issues to any of the coaches working a particular shift. (Pf. SOF ¶ 3).

James Koza ("Koza") was the head coach at JAX Franklin. (Def. SOF ¶ 2). Directly beneath Koza was Chris Walters ("Walters"), the coach in charge of services. (Walters Depo. at 11). Marissa Davis ("Davis") was the coach in charge of the hosti stand,[4] and

---

[2] The restaurant is in the Cool Springs Galleria Mall in Franklin. (Conlin Depo. at 21). Hence it also is sometimes referred to as Alexander's Restaurant Cool Springs.

[3] Where a particular fact is undisputed, reference is made to the Statement of Facts. Where a fact is disputed, reference is made to the underlying documentation for that fact.

[4] The "hosti" is the term used by JAX for the people who answer the telephone and greet guests as they arrive at the restaurant. (Koza Depo. at 17).

2

occasionally acted as floor supervisor for the servers at JAX Franklin. (Davis Depo. at 10-12; Pf. SOF ¶ 4). Christopher Collier ("Collier") was the coach in charge of the pub. (Collier Depo. at 15). Brian Lisko ("Lisko") was a kitchen coach. (Walters Depo. at 4-5).

Approximately once a week, all of the coaches would meet as a group.[5] During some of those meeting, staffing issues, including whether more Pub Keeps were needed and who might make a good Pub Keep, were discussed. (Pf. SOF ¶ 2). The final decision, according to Koza, however, was made by him, as were decisions relating to selection of employees for the service staff. (Koza Depo. at 25-29).

Nevertheless, it is clear that Koza sought out and received input from the coaches regarding who would be a good Pub Keep. Walters described the process as follows:

> We as a team, management team, would in a sense nominate someone and say I think this person is, is capable of performing the duties of a, of a Pub Keep. And we would talk about it as a group, and then ultimately James Koza would make a decision.

(Walters Depo. at 23; see also, Davis Depo. at 17-19). All of the coaches would participate in the meetings and provide their thoughts on who would make a good Pub Keep. (Walters Depo. at 25).

---

[5]The management team at JAX Franklin tried to meet weekly although, because of the press of business, sometimes they met every couple of weeks. (Koza Depo. at 21; see Collier Depo. at 17). The meetings were called "Directional Meetings." (Walters Depo. at 24).

3

As described by Collier, the decision as to who should work in the pub was "a group effort" made "by management staff." (Collier Depo. at 16).

Even though he had the final say, Koza too saw selection of Pub Keeps as a collaborative effort:

> Q. Oh, okay. Were there Pub Keep vacancies during the time you were the general manager at the Franklin restaurant?
> A. There, there were needs that we had behind the pub that we filled during the time I was the general manager at the restaurant. I hope that answers your question.
> Q. What did you do when that sort of need developed?
> A. Again, I hope I'm answering your question. We would look at the existing staff that we had and select who we thought was the best fit given their availability, given their tenure, tenure, what we anticipated in terms of them being able to work, and as to whether or not their performance had thus far been exemplary within the restaurant.
> Q. And when you said we, who were you referring to? Who would be considering those things?
> A. I would, but I would also solicit the opinion of the managers around me.
>              \*             \*             \*
> Q. And who would have the final decision about who to move into doing pub work?
> A. I would.
> Q. And did I understand you to say you would normally consult with your coaches, your managers before making that decision?
>     Ms. Neff: Object to form. Asked and answered.
> A. Yes.

(Koza Depo. at 22-23 & 29).

The Interveners began working as dining room servers at JAX Franklin restaurant in late 2001. (Def. SOF ¶ 1). Each had a desire to become Pub Keeps at one time or another, although admittedly none ever expressed that desire directly to Koza. (Def.

4

SOF ¶ 4). Experience as a bartender was not an absolute prerequisite for the Pub Keep position. (Pf. SOF ¶ 6).

JAX maintains that a transfer into the pub from the service staff was not a promotion, at least in terms of compensation. However, each of the Interveners testified that they believed they could make more money as a Pub Keep. (See Baker Depo. at 98-105; Cedillo Depo. at 54-56 & Henderson Depo. at 48-49). Moreover, Koza himself indicated that while he viewed the move a "transition," there could be a difference in the base pay, depending upon the shift. (Koza Depo. at 32-35).

Baker was promoted by Koza to the position of Server-Trainer because Baker demonstrated proficiency at being a Server. (Def. SOF ¶ 7). While Baker did not discuss with Koza the possibility of being a Pub Keep, he did discuss this with Collier on three or four occasions. According to Baker, Collier said "we'll see," but also said that corporate was looking to hire women to work behind the bar in order to increase business. (Id. at 64-68, 74).[6]

Baker also claims he asked Davis about becoming a Pub Keep but she replied that since Baker "didn't have boobs" he could not work behind the bar. (Baker Depo. at 50-53). According to Baker, Davis

---

[6]Collier testified he discussed this with all of the managers, including Koza, and all of the managers were favorably impressed with Baker. (Collier Depo. at 43-44).

5

explained that "corporate"[7] had made a decision to hire more females to work behind the bar in order to increase business. (Id.).[8]

Like Baker, Henderson never expressed an interest in working as a Pub Keep to Koza. (Def. SOF ¶ 19). He does, however, claim he told Collier on two occasions that he wanted to work in the pub. Collier told him something to the effect that "you're not a hot chick, and until you become a hot chick, you're not going to work in the pub." (Henderson Depo. at 82). Collier also allegedly told him that "'Lonnie'[9] wanted there to be nothing but female bartenders." (Henderson Depo. at 86). Similarly, Henderson claims that Lisko told him Lonnie wanted females as Pub Keeps in order to change the image of the bartenders at the restaurant. (Id. at 89). Henderson claims that after speaking with Collier and Lisko, he spoke with Davis who also told him that Lonnie wanted females behind the bar. (Id. at 92).

Like Baker and Henderson, Cedillo did not express an interest in a Pub Keep position with Koza, but asserts he did express it to

---

[7]According to Baker, when Davis said it was a "corporate decision," she indicated the mandate came from Chris Conlin who was the district supervisor. (Baker Depo. at 53).

[8]Baker also states he mentioned becoming a Pub Keep to Lisko, who told him he should talk to Collier or Walters. (Baker Depo. at 76).

[9]The reference to "Lonnie" is Lonnie Stout, the Chief Executive Officer of JAX.

6

other coaches at JAX Franklin, including Collier on a couple of occasions who said "we'll see." (Cedillo Depo. at 63-64). He also allegedly spoke with Lisko "quite a few times" who said, "They don't want guys back there. They want girls back there."[10] (Id. at 66 & 68). After talking to Lisko, Cedillo then spoke with Walters who allegedly told Cedillo he "did not have the right equipment" and then said "you don't have these" as he held his hands near his chest as if cupping breasts. (Id. at 72-73 & 148). Walters also allegedly told him "they" did not want men behind the bar. (Id. at 74).[11]

   Koza contends he probably would not have transferred Baker to a Pub Keep position because Baker was too essential as a server-trainer. He states he would not have moved Henderson into the position of Pub Keep because Henderson performed inconsistently as a server, he had disciplinary problems, he was tardy, he failed to properly cover shifts, and he was involved in a family business. (Koza Depo. at 44-47). Koza alleges he would not have moved Cedillo into the position because of his inconsistent performance and the guest complaints which had been received. (Id. at 48).

---

   [10]According to Cedillo, "they" meant "J. Alexander's." (Cedillo Depo. at 68).

   [11]Brandie Gartman, who formerly worked as a Pub Keep at JAX Franklin testified in her deposition that Davis told her Lonnie wanted more women behind the bar since the patrons were primarily male. (Gartman Depo. at 68-69).

7

Although none of the Interveners were transferred into the position of Pub Keep, JAX Franklin has employed male Pub Keeps, before and after the relevant time period concerning the Interveners' complaints.

During the time period in question, JAX had in place a written non-discrimination policy. Though having received the policy, none of the Interveners ever utilized the framework established in the policy to complain about not receiving a Pub Keep position.

None of the Interveners requested assignment to the Pub Keep position at JAX Memphis. However, Plaintiffs have submitted the affidavit of Sarah Looney ("Looney") who worked there as a server and then became a Pub Keep at JAX Memphis. She claims that in October or November of 2002, either the bar manager, Kelly Larson, or the General Manager, Roger Labrie, asked her to move from server to Pub Keep and said they were trying to get more women behind the bar to increase bar business. According to Looney, another female, Holli Yon ("Yon"), was also asked to move to the position of Pub Keep at about the same time. When a vacancy arose, both Yon and Looney were asked about potential replacements and they suggested the names of three males, but were split on how "their personalities would work in the Pub Keep job." (Looney Aff. at 2). Instead of any of the three males, two females, including Yon's little sister, were moved to the position of Pub Keep. (Id.).

8

## II. STANDARD OF REVIEW

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In

9

ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III. ANALYSIS

In its Motion for Summary Judgment, JAX claims the EEOC and Interveners cannot establish JAX engaged in a practice of reverse gender discrimination in the selection of Pub Keeps, nor can they state a prima facie case of reverse gender discrimination. (Docket Entry No. 16, at 9 & 14). By way of response, Plaintiffs assert they are not claiming that this is a practice case, but instead this is a disparate treatment case. (Docket Entry No. 24 at 1 & 9-10). As for a *prima facie* case of discrimination, Plaintiffs claim they have direct evidence of discrimination. (Id. at 1 & 10). While the Court agrees with Plaintiffs insofar as the nature of their claims against JAX Franklin, the same cannot be said with respect to JAX Memphis.

**A. Claims Against JAX Franklin**

JAX's Motion for Summary Judgment with respect to JAX Franklin hinges upon its contention that all of the individual Plaintiffs knew Koza made the hiring, firing and transfer decisions and because each individual Plaintiff failed to mention to Koza his interest, JAX contends this failure is fatal to the claims of the individual Plaintiffs. (See, Docket Entry No. 27 at 1).

10

According to JAX, since none of the individual Plaintiffs asked Koza for such a job, and since Koza made none of the discriminatory comments which were purportedly made, Plaintiffs cannot establish a claim for gender discrimination.

"In order to establish a Title VII employment discrimination claim, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discrimination." Johnson v. Kroger Co., 319 F.3d 858, 864-65 (6th Cir. 2003). In this case, Plaintiffs seek to prove their case utilizing direct evidence.

The Sixth Circuit recently noted, "[v]ery few cases exist to provide guidance on direct-evidence analysis in the arena of employment discrimination." DiCarlo v. Potter, 358 F.3d 408, 416 (6th Cir. 2004. This is probably because "direct evidence of discrimination - a 'smoking gun' attesting to a discriminatory intent, . . . - is typically unavailable[.]" Holtz v. Rockefeller & Co., 258 F.3d 62, 76 (2d Cir. 2000)(internal citations and quotation marks omitted). Even though few cases may exist regarding direct evidence as opposed to circumstantial evidence cases, it is clear that there are issues of fact in this case with respect to JAX Franklin which preclude summary judgment.

The Sixth Circuit has explained "direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's

11

actions." Jacklyn v. Shering-Plough Healthcare Prods. Sales Corp., 176 F.2d 921,926 (6th Cir. 1999). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." Johnson, supra, 319 F.3d at 865.

In the present matter, it can hardly be said that statements such as "we want more females behind the bar," "you cannot work behind the bar because you 'don't have boobs,'" "until you become a 'hot chick' you cannot work as a Pub Keep," and "you cannot work in the bar because 'you don't have the right equipment'" (done in the context of the speaker holding his hand up to his chest) do not constitute direct evidence of gender discrimination. JAX does not seriously contend otherwise, but instead focuses on each of the Intervener's failure to ask Koza about becoming a Pub Keep. Moreover, JAX contends any statements made about the desire to have females as opposed to males in the bar were made by non decision-makers. (See Docket Entry No. 16, at 14-16; Docket Entry No. 27, at 3).

With regard to its position that the Interveners' did not "apply" for the position of Pub Keep because they each failed to ask Koza, JAX asserts "the present case is analogous to Leadbetter v. Gilley, 385 F.3d 683 (6th Cir. 2004), in which a white male

12

university employee was passed over for (1) a general counsel position due to his gender and (2) an administrative position due to his race." (Docket Entry No. 16 at 16). What JAX fails to note, however, is that the Plaintiff in Leadbetter "state[d] he *might* have been interested" if he would have been paid more than the person who previously held the job. Leadbetter, supra, 385 F.3d at 693 (emphasis added). Plaintiff in that case also failed to show applying for the position would have been fruitless, such as where the employer had a "blacks only hiring requirement." Id.

In this case, a fair inference to be drawn from the evidence is that each of the Interveners expressed more than a general interest in the position of Pub Keep and none of them expressed that interest in a conditional fashion, as did the Plaintiff in Leadbetter. While the evidence suggests that JAX did not have a "female only hiring requirement" for the position of Pub Keeps, the inference to be drawn from the evidence construed in Plaintiffs' favor is that there was a strong preference for women Pub Keepers at JAX to the exclusion of men based upon gender alone.

In contrast to Leadbetter, the Interveners each repeatedly asked members of management about transferring into the bar and were repeatedly told about the alleged preference for females in that position. Their failure to ask Koza directly is not fatal to their claim.

13

JAX also argues it cannot be liable because any purported statement about the desire to have females behind the bar was made by those who were not the final decision-makers. However, Koza's decision about who to place in the bar was not made in a vacuum. Instead, Koza affirmatively sought input from the coaches as to who would be a good Pub Keep.

In order to determine whether allegedly discriminatory remarks are relevant to a claim that an adverse employment decision was motivated by impermissible considerations, the Court looks not only to the speaker's role in the employment decision, but also to the substance of the discriminatory remarks. <u>Ercegovich v. Goodyear Tire & Rubber Co.</u>, 154 F.3d 344, 355 (6th Cir.1998). Here, the substance of most of the remarks was far from ambiguous because they clearly expressed gender-based favoritism. The issue then is what role the purported speakers had in the decision-making process.

Generally, a "statement by an intermediate level management official is not indicative of discrimination when the ultimate decision. . . is made by an upper level official." <u>McDonald v. Union Camp Corp.</u>, 898 F.2d 1155, 1161 (6th Cir. 1990). However, that "rule was never intended to apply formalistically" and hence "remarks by those who did not independently have the authority or did not directly exercise their authority . . . but who nevertheless played a meaningful role in the decision . . . [a]re

14

relevant." Ercegovich, supra, 154 F.3d at 354-55, citing, Kelley v. Airborne Freight Corp., 140 F.3d 335, 347-48 (1st Cir. 1998)(statement by head of human resources who "participated closely" in plaintiff's termination was admissible to show a "discriminatory atmosphere"); Abrams v. Lightolier Inc., 50 F.3d 1204, 1214 (3d Cir. 1995)(age related statements of corporate vice president who may have "played a role" in the decision to terminate the plaintiff were relevant). "Similarly, the discriminatory remarks of those who may have influenced the decision not to reassign the plaintiff to other positions in the company may be relevant when the plaintiff challenges the motive behind the decision." Ercegovich, supra, 154 F.3d 355.

In this case, this Court must therefore determine whether a reasonable jury could conclude that the coaches were in a position to influence the decision to deny the Interveners' request to transfer into the pub and work as Pub Keeps. Certainly, a jury could so conclude given Chris Walters statement that the "management team, would in a sense nominate someone" and the coaches (including head coach Koza) would "talk about it as a group"; Collier's testimony that the decision as to who should work in the pub was "a group effort" made "by management staff"; and Koza's admission that he would "solicit the opinion of the managers around me."

15

The statements alleged to have been made about there being a preference for women in the pub make it easy to answer the question posed by the Supreme Court in Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775 (1989): "[i]n saying that gender played a motivating part in an employment decision, we mean that, if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be that the applicant or employee was a []man." Id. at 250, 109 S.Ct. at 1790. The record before the Court includes a number of anti-male statements regarding men working as Pub Keeps. These statements were made by several different coaches who presumably constituted the management team at JAX Franklin. More specifically, the individual Plaintiffs were told that "corporate" had made the decision to hire more women behind the bar in order to increase business, that you needed to be a "hot chick" to work behind the bar, that the CEO of JAX wanted nothing but female bartenders, and that management did not want guys behind the bar. The Court finds from the evidence presented that a reasonable jury could conclude that one of the reasons the Interveners were not hired as Pub Keeps at JAX Franklin is because they were men.

In its reply, JAX asserts the Plaintiffs have failed to respond to its assertion that, leaving aside the alleged discriminatory statements, Koza still would not have transferred any of the Interveners to the position of Pub Keeps. (Docket Entry

16

27 at 4). However, JAX's contention goes to the issue of pretext which is part of a circumstantial case under McDonnel Douglas, not a direct evidence case. See DiCarlo, supra 358 F.3d at 415 ("[w]hen proving a claim through the use of direct evidence, a plaintiff does not have to proceed under the *McDonnell Douglas* burden-shifting framework that applies to circumstantial cases").

"As a matter of analysis and practical application, this Court believes that direct proof of [sex] discrimination sufficient to establish a *prima facie* case may also be the same proof that overcomes the employer's explanation. In other words, the direct proof of [sex] discrimination may constitute proof that the employer's proffered reason for the employment decision is not the actual reason for the decision or is insufficient to explain the employer's action." Kresnak v. City of Muskegon Heights, 956 F.Supp. 1327, 1336 (W.D. Mich. 1997). See also, Kocak v. Community Health Partners, 400 F.3d 466, 470 (6th Cir. 2005)("if [plaintiff] has produced direct evidence that creates a genuine issue of material fact . . . her . . . claim survives summary judgment").[12]

---

[12]JAX also point out that Plaintiffs have not responded to its assertion the Interveners did not utilize any of JAX's administrative procedures to report their claims of discrimination and have those claims addressed internally. Obviously, such failure does not mean they cannot pursue this litigation. Such evidence goes to the good faith of JAX and will be an issue to be taken into account by the fact-finder.

17

B.  *Claim Against JAX Memphis*

Defendant asserts that with the EEOC's admission this is not a "pattern and practice" case, the claim against JAX Memphis fails. This Court agrees because the EEOC has identified no one who believed he was discriminated against because of the purported preference for female Pub Keeps at the Memphis restaurant.

In its Complaint, the EEOC states that it "is expressly authorized to bring this action by Section 706(f)(1) of Title VII, 42 U.S.C. § 2000e-5(f)(1)" and that "[a]ll conditions precedent to the institution of this action have been met." (Docket Entry No. 1, ¶¶ 3 & 6). While that may be so with respect to JAX Franklin, the same cannot be said about JAX Memphis.

Under Section 706, the EEOC may initiate actions in federal district court to enforce the rights of persons employed by private-sector employers. However, by the terms of the statute, such actions may only be brought "after a charge is filed." 42 U.S.C. §§ 2000e-5(f)(1). This is part of "an integrated, multistep enforcement procedure culminating in the EEOC's authority to bring a civil action in a federal court" which "begins when a charge is filed with the EEOC alleging that an employer has engaged in an unlawful employment practice." Occidental Life Ins. Co. of California v. E.E.O.C., 432 U.S. 355, 359, 97 S.Ct. 2447 (1977).

Here, there is no evidence that a charge was filed with respect to JAX Memphis. In fact, in the Complaint, the only

18

charges listed are those filed by Baker, Henderson, and Cedillo, all of whom worked at JAX Franklin.

Even if it could be said this suit was properly filed with regard to JAX Memphis, it is clear that summary judgment nevertheless would be appropriate with respect to JAX Memphis. In support of the claim relating to JAX Memphis, the EEOC filed the affidavit of Looney. Leaving aside the fact that the affidavit contains some hearsay and a "party opposing a motion for summary judgment cannot use hearsay . . . to create a genuine issue of material fact," Sperle v. Michigan Dept. of Corrections, 297 F.3d 483, 495 (6th Cir. 2000), Looney's affidavit is not sufficient to defeat the motion for summary judgment because she does not claim any male servers were even interested in working behind the bar as Pub Keeps. There simply is not sufficient evidence to establish that any particular employee at JAX Memphis was "discriminate[d] against . . . with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex [.]" 42 U.S.C. § 2000e-2(a)(1).

## IV. Conclusion

On the basis of the foregoing, Defendant J. Alexander's Restaurant Inc.'s Motion for Summary Judgment (Docket Entry No. 13) will be granted in part and denied in part. It will be granted with respect to the claims made against J. Alexander's Restaurant

19

in Memphis, Tennessee, but denied with respect to the claims made against J. Alexander's Restaurant in Franklin, Tennessee.

An appropriate Order will be entered.

_____
Robert L. Echols
United States District Judge